ELLEN M. CAREY, ESQ. (Cal. Bar No. 310922)
**FORDE & O'MEARA LLP**
191 N. Wacker Dr., 31st Floor
Chicago, Illinois 60606
(312) 641-1441
*Attorney for Plaintiffs Darryl Ferguson and DGF Investments, LLC*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### CIVIL DIVISION

| | |
|---|---|
| DARRYL FERGUSON, an individual; and DGF INVESTMENTS, LLC, a limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL BRIAN SCHATT, an individual; JOSEPH JOHN PODULKA, an individual, and TRAVIS PEREZ, an individual.<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Fraud – Intentional Misrepresentation**<br>2. **Fraud – False Promise Without Intention to Perform**<br>3. **Fraudulent Concealment**<br>4. **False Advertising (Cal. Bus. & Prof. Code §§ 17500 *et seq.*)**<br>5. **Unlawful Business Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**<br><br>**DEMAND FOR JURY TRIAL** |

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

Plaintiffs DGF INVESTMENTS, LLC and DARRYL FERGUSON (collectively "Plaintiffs") allege the following claims against Defendants DANIEL BRIAN SCHATT, JOSEPH JOHN PODULKA and TRAVIS PEREZ (collectively "Defendants") as follows:

**THE PARTIES**

1. Plaintiff DGF INVESTMENTS, LLC ("DGF") is a limited liability company organized under the laws of Arizona with its principal place of business at 1911 E. Schooner Ct. in Gilbert, Arizona. DGF is manager-managed by its sole member, DARRYL FERGUSON, who is domiciled in Arizona.

2. Plaintiff DARRYL FERGUSON ("Ferguson") is an individual who resides and is domiciled at 1911 E. Schooner Ct. in Gilbert, Arizona. He is a career airline pilot.

3. Defendant DANIEL BRIAN SCHATT ("Schatt") is the co-founder and former Chief Executive Officer of Cred Inc. ("Cred"). Schatt became CEO in mid-to-late-2018. Schatt owned 50% of Cred. Schatt resides at 3704 Wilshire Avenue in San Mateo, CA 94403. Upon information and belief, Schatt worked in California during all relevant periods described in this Complaint.

4. Defendant JOSEPH JOHN PODULKA ("Podulka") was Cred's Chief Financial Officer from July 2019 to December 2020. Podulka resides at 3837 Carlson Court in Palo Alto, California 94306. Upon information and belief, Podulka worked in California during all relevant periods described in this Complaint.

5. Defendant TRAVIS PEREZ ("Perez") served as the Vice President for Wealth for Cred from April 2019 to December 2020. Perez resides in Los Angeles, California. Upon information and belief, Perez worked in California during all relevant periods described in this Complaint.

6. At all times mentioned herein, each of the Defendants was the agent, principal, partner, joint venturer, employee, and/or authorized representative of every other Defendant and, in doing the things hereinafter alleged, was acting within the course and scope of such agency, service, and representation and directed, aided and abetted, authorized, and/or ratified each and every act and conduct hereinafter alleged.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. DGF is a limited liability company organized under the laws of Arizona with its principal place of business in Arizona. DGF's only member, Ferguson, is domiciled in Arizona. DGF has no members domiciled in California. Ferguson is a citizen of Arizona. Defendants are all citizens of California.

8. The exercise of personal jurisdiction over Defendants is reasonable and proper because they are both residents domiciled in California and because, at the time pertinent to these allegations, Defendants transacted business and derived substantial revenue from services rendered in California. Moreover, Defendants have committed tortious acts in California causing injury to Plaintiffs.

9. Venue is proper under 28 U.S. Code § 1391(b)(1) because this District is a judicial district in which at least one of the Defendants resides and all Defendants are residents of California, the State in which this District is located. Venue is further proper in this District because a substantial part of the events or omissions giving rise to this Complaint occurred, and a substantial part of property that is the subject of the action is situated in this District.

10. <u>Divisional Assignment</u>. A substantial portion of the tortious actions giving rise to the injuries alleged in this Complaint occurred in San Mateo, California. N.D. Cal., Civil L.R. 3-2(d).

## FACTUAL ALLEGATIONS

**A. Ferguson's Initial Investment In CredEarn.**

11. Schatt was a founder and director of Cred, a cryptocurrency company that was based in San Mateo, California. Schatt was also Cred's CEO. With Schatt at the helm, Cred sought to raise crypto for a yield-earning program called CredEarn in which customers lent their crypto to Cred.

12. The CredEarn program allowed customers to earn a return on their crypto by lending their crypto to Cred for a fixed period. Cred would then convert the crypto into fiat currency (*i.e.*, a government-issued currency) and attempt to invest the funds at a higher rate of interest than it was required to pay the CredEarn customers. At the end of the lending term, Cred would repurchase the crypto and return it to the customer along with the interest earned.

13. To spur investment in the CredEarn program, Schatt and Podulka enlisted numerous representatives to solicit investments from individuals owning cryptocurrency. One of the CredEarn program's sales representatives was Perez, who served as the Vice President for Wealth for Cred from April 2019 to December 2020.

14. Schatt and Podulka understood that customers would be hesitant to enter into the CredEarn program because unsecured loans to a new and untested company were risky. To solve this problem, Schatt and Podulka advertised the CredEarn program through false assurances that would induce participants into joining the program. Schatt and Podulka crafted and/or approved a public statement that falsely represented that Cred was comprehensively insured for its customers' losses. Schatt and Podulka knew these representations would be posted on or linked to Cred's website, sent directly to potential customers, disseminated on the internet, and used or distributed in other ways that customers could see them including through Cred representatives like Perez. But contrary to these fraudulent statements, Cred's insurance clearly did not cover CredEarn customers' losses or the vast majority of the losses that led to Cred's downfall.

15. Knowing that the insurance Cred was acquiring was a token amount, Schatt instructed Cred employees starting in May 2019 to hide policy limits from customers, other than when they could exaggerate the coverage through live conversations with investors.

16. One of the customers Perez solicited to invest in the CredEarn program was Ferguson. At the direction of Schatt, Perez falsely advised Ferguson that his investment was fully insured and that he would be made "whole" in the event that anything happened to Ferguson's investment.

17. In reliance on this false representation, and others made by Perez and on Cred's website and in Cred marketing materials, Ferguson loaned 10.3 Bitcoin tokens to the CredEarn program on October 24, 2019 (the "First Loan"). Ferguson's investment was consummated through an agreement signed and ratified by Schatt. The First Loan was eventually repaid in full and with interest.

**B. CredEarn's Faulty Financial Model.**

18. Unbeknownst to Ferguson, the CredEarn was based on a precarious financial model that was doomed to fail at the time of his initial investment. Cred loaned the CredEarn cryptocurrency that it received from customers like Ferguson to a Chinese micro-lending platform, MoKredit, owned by

Lu Hua ("Hua"), Cred's cofounder and 50% equity owner. In turn, MoKredit lent those funds to MoKredit's customers. MoKredit's customers were purportedly thousands of video gamers primarily in China who would borrow small sums at high interest rates, often exceeding 35%.

19. At MoKredit's request, Cred's dealings with MoKredit were entirely in stablecoin, a cryptocurrency whose value is pegged, or tied, to that of another currency, commodity, or financial instrument. Because Cred owed its CredEarn customers cryptocurrency, plus interest, this arrangement left Cred exposed to price increases in BTC, ETH, and other cryptocurrencies.

20. In an effort to mitigate the risk associated with an increase in prices of cryptocurrency, Cred hired a firm to create and execute a "hedging strategy." Pursuant to this hedging strategy, the firm entered into options, futures, and "perpetual swaps" (or "perps") for Cred in order to hedge against an increase in the price of cryptocurrency.

21. Cred and MoKredit's relationship was governed by a series of agreements and tranches for additional loan amounts that are subject to those agreements. MoKredit and Cred executed a loan and security agreement ("LSA") with an effective date of December 27, 2018. The LSA governed MoKredit's borrowing of funds from Cred, which largely consisted of CredEarn loan proceeds.

22. MoKredit was obligated to repay obligations outstanding under the LSA upon the sooner of (i) the maturity date of the loan or (ii) 30 days' notice by Cred at Cred's discretion.

23. MoKredit consistently did not repay principal on the maturity dates.

24. When MoKredit failed to repay principal, Cred would allow MoKredit to "roll" the principal amounts owed to the next "tranche." Podulka testified about the MoKredit principal payments as follows: "the money, when a tranche would close, wouldn't necessarily result in a flow of cash to Cred. It could be reenrolled in another program or tranche."

25. None of these loans, the relationship with MoKredit, or Cred's hedging activities were disclosed to customers like Ferguson.

**C. Cred's Financial Position Becomes More Dire.**

26. Since inception, Cred's liabilities exceeded its assets, and its financial situation never meaningfully improved. Cred continued to take on more and more debt. All the while it was suffering

loss after loss in trading, hacks, and thefts. Cred also funneled over 90% of the cryptocurrency it received under the CredEarn program to MoKredit, who defaulted.

27. The entire CredEarn offering consisted of Cred assuming more and more debt it owed to its customers. Cred plunged deeper into debt each time Cred obtained more customer cryptocurrency through the CredEarn program. By March of 2020, Schatt testified that Cred was in "desperate need of cash."

28. In early March 2020, there was a drop in the price of BTC. This drop in the price of BTC caused a liquidation of Cred's highly leveraged hedging positions. In a single day on March 13, 2020, Cred lost more than $100,000,000 in cryptocurrency at today's prices. Because Cred lacked the cash or cryptocurrency to re-establish its hedging positions, those March 13, 2020 trading losses also left Cred exposed to significantly more losses if BTC and other cryptocurrencies increased in value.

29. As a result of the crash, Schatt testified that Cred "lost all of its hedging abilities." Schatt testified that "there [were] strains in [MoKredit's] business as a result" of the COVID-19 pandemic. He also testified that MoKredit "wasn't able to confirm that he could actually get all of that principal back."

30. At the end of March 2020, MoKredit proposed a payment plan to Cred as follows:

April: Full payment of interest @ 20% [~$650,000] + $100,000 principal.

May: Full payment of interest @ 20% [~$650,000] + $200,000 of principal.

June: Full payment of interest @ 20% [~%650,000] + $4 million of principal.

July: Full payment of interest @ 20% [~$650,000] + $4 million of principal.

31. Cred accepted this payment plan. MoKredit made partial payments in April and May and did not make any of the other payments.

32. On April 5, 2020, a Liquidity Memo was circulated to Schatt and Podulka. The Liquidity Memo reported the following:

> several financial hedging instruments of Cred LLC were liquidated given the falling market prices. The resulting short position on BTC has a strike price of approximately $5,900 – about 800 BTC was lost in the arrangement . . . The simultaneous decline in global liquidity

created additional balance sheet issues for Cred LLC. Specifically, a principal recall of approximately $10 million from a lending partner (MoKredit) was delayed given liquidity issues in the Chinese Consumer loan portfolio. As a result, it was not possible to reconstitute the appropriate hedging instruments at a more favorable market price.

33. The Liquidity Memo outlined the sources of liquidity for Cred to include: (i) approximately $350,000 in cash on the balance sheet; (ii) loans from the portfolio amounting to approximately $2 million; (iii) revenue from generating net interest margin from the loan portfolio amounting to approximately $700,000 to $1 million; and (iv) additional contributions to CredEarn. The Liquidity Memo concluded: "Based on the cash flow analysis, a potential cash liquidity issue is identified for May 2020 given the delay in receiving principal back from MoKredit and minimal working capital available on the balance sheet."

34. In reality, the Liquidity Memo grossly understated the amount of cryptocurrency trading losses Cred suffered in March of 2020. Although the Liquidity Memo reflected a loss of approximately 800 BTC, financial records confirm that Cred suffered significantly higher losses.

35. Schatt and Podulka also knew that MoKredit's proposed repayment schedule was insufficient to satisfy its liquidity needs. The Liquidity Memo contained a recommendation that Cred request an additional $3.3 million from MoKredit and an additional $1 million if the cryptocurrency prices continued to increase. MoKredit could not and did not make those payments.

36. The Liquidity Memo recognized that Cred was completely exposed to the rise in the price of cryptocurrency as it would significantly increase the value that Cred owed its CredEarn customers like Ferguson:

> It's important to note the key risk in the recommended strategy is a significant increase in cryptocurrency prices. With the strategy above, assuming a 75% increase in cryptocurrency prices by the end of 2020, an additional $1 million will be needed from MoKredit (in addition to the current repayment schedule) in order to reconstitute the hedging program absent significant acceleration in growth of the loan portfolio. We believe an additional $1 million should also be requested as buffer for the hedges and to opportunistically take advantage of downward movements in prices.

37. On April 5, 2020, Schatt forwarded the Liquidity Memo to Hua. On April 25, 2020, Schatt followed up with Hua to ask if there were updates regarding MoKredit's repayment schedule because Cred was "looking for funds as soon as possible to rebuild the hedges." Hua responded that there was "no change to the payment schedule since [they] discussed last time."

**D. In Desperate Need of Cash, Defendants Target Ferguson.**

38. By the spring of 2020, Cred was in dire financial straits and in need of additional cryptocurrency infusions in the form of loans from customers. One of the customers Defendants solicited at this time was Ferguson. Schatt and Podulka directed Cred sales personnel, including Perez, to continue to solicit investments from unwitting customers like Ferguson, all without disclosing the true financial condition of Cred and while representing that Cred remained safe and secure.

39. During the first quarter of 2020, Ferguson had multiple communications over the phone and e-mail with Perez about opportunities for lending additional bitcoin to Cred. On multiple occasions, Perez represented that Cred was safe, secure, and that the company was performing well, and encouraged Ferguson to deposit more of his bitcoin into Cred. On information and belief, Schatt and Podulka directed Perez to make such representations about the financial health of Cred, which were false at the time, authorized or ratified such representations, or falsely represented the same to Perez, who then passed along the false representations to Ferguson.

40. In January 2020, with the assistance of Perez, Ferguson opened an account for DGF Investments, through which he could invest bitcoin held by Ferguson's IRA account.

41. On March 15, 2020, after the huge drop in bitcoin prices, Ferguson e-mailed Perez stating that he "just wanted to check on the health of my BTC, and my position in general." Perez responded the following day, saying "Good news is we were well positioned for this event and have not run into any issues so far."

42. In follow-up phone conversations, Perez told Ferguson that the financial condition of the company was strong, and that Ferguson had no cause for concern. On information and belief, the false information about the company's financial condition was provided to Perez by Schatt and Podulka.

43. At the urging of Perez, in early April 2020, DGF, through Ferguson, agreed to lend 13.9 bitcoin to Cred (the "Second Loan"). The loan agreements for the Second Loan were again signed by Schatt. At the time that Ferguson entered into the loan agreement for the Second Loan and sent the bitcoin, Defendants did not inform him that Cred was nearing insolvency and in dire financial condition, and needed his capital to make payments to Cred's lenders and executives, including Schatt and Podulka. Rather, at the urging of Schatt and Podulka, Ferguson was told by Perez that Cred remained safe, secure, and low risk given the financial strength of the company and the industry leading insurance that it purportedly had.

44. At the time that DGF made the Second Loan, the 13.9 bitcoin that Ferguson sent to Cred were worth approximately $97,500.

45. Around the time Cred fraudulently solicited 13.9 bitcoin from Ferguson and DGF, its financial struggles continued. MoKredit continued to default on its principal repayments to Cred. In the middle of May, Hua communicated that MoKredit would not be able to pay the two $4 million principal payments to Cred for June and July, totaling $8 million.

46. In a memorandum titled Liquidity Analysis and Plan to Overcome Current Undercapitalization from Schatt dated June 1, 2020, he wrote:

> As of June 1, 2020, Cred's current liabilities exceeded its invested assets and current assets by approximately $19.5 million or 19% of the total principal balance of liabilities . . . **Cred does not have the capacity to repay the full liabilities if assets were liquidated today** . . .

47. By June of 2020, if not before, Schatt and Podulka knew that Cred was certainly insolvent and would be imminently bankrupt. Schatt and Podulka also knew that investors in the CredEarn program, like Plaintiffs, would lose the entirety of their investment which, contrary to their representations, was not insured.

48. The 13.9 bitcoins were not enough for Defendants – they needed more. And so, Schatt and Podulka directed Cred's sales representatives to keep hounding innocent investors like Ferguson, and to keep pushing the message of Cred's attractive interest rates, offered at low- or no-risk given the

financial strength and industry-leading practices of Cred. Schatt and Podulka knew these messages were false, and yet instructed their sales team to keep pushing them.

### E. At The Direction Of Schatt And Podulka, Ferguson Is Fraudulently Induced To Invest An Additional 50 Bitcoin In CredEarn Before Its Imminent Bankruptcy.

49. To prolong imminent bankruptcy for their own personal financial gain, Schatt and Podulka instructed Cred representatives, including Perez, to continue soliciting investments in the CredEarn program.

50. At the direction of Schatt and Podulka, Cred representatives, including Perez, were instructed to conceal Cred's imminent bankruptcy and dire financial condition from potential investors, including Ferguson and DGF.

51. At the direction of Schatt and Podulka, Cred representatives, including Perez, were instructed to falsely represent to investors that their investment was insured from any losses.

52. In August of 2020, at the direction of Schatt and Podulka, Perez contacted Ferguson to discuss a "unique," brand-new offering in CredEarn. Perez represented to Ferguson and DGF that the offering was available only to trusted clients who could contribute a minimum of $500,000 in cryptocurrency. Perez urged Ferguson and DGF to act quickly to take advantage of the limited offer.

53. Based on their prior discussions and e-mails, Perez knew that Ferguson was interested in a product where the interest would be paid out in bitcoin as opposed to in U.S. dollars. (Indeed, in an October 2019 e-mail with Perez, Ferguson referred to an "interest in-kind" program at Cred as a would-be "killer app" and said "I sincerely DO hope the in-kind eventually becomes available."). The interest rates offered for the opportunity were as high as 9%. Earning such a high return, which would be paid in bitcoin, was exactly what Ferguson was looking for, and Defendants knew it. Desperately in need of funds and teetering on the verge of bankruptcy, Defendants designed the perfect targeted pitch for Fergson and DGF.

54. At the direction of Schatt and Podulka, in August 2020, Perez falsely represented to Ferguson and DGF that Cred was solvent, this his investment was insured and that he would reap significant financial benefits from investing in CredEarn.

55. At the time of these knowingly false statements, Perez was acting as the agent, principal, partner, employee, and/or authorized representative of Schatt and Podulka and was acting within the course and scope of such agency, service, and representation. Schatt and Podulka directed, aided and abetted, authorized, and/or ratified each and every false statement and omission made by Perez to Plaintiffs.

56. Ferguson and DGF relied on the representations and omissions of Perez, which were made at the direction of Schatt and Perez and transferred 50 Bitcoin to Cred on or about August 21, 2020 (the "Third Loan"). At the time of this transfer, the value of 50 Bitcoin was roughly $593,900.

57. Schatt ratified the fraudulent misrepresentations and omissions made by Perez. On August 21, 2020, Schatt signed the transfer agreement consummating this transaction. At no point did Schatt advise Ferguson or DGF that Cred was insolvent or that his investment was not insured.

58. Podulka ratified the fraudulent misrepresentations and omissions made by Perez. On October 5, 2020, Podulka signed and sent Ferguson a letter memorializing his holdings in CredEarn. The letter was prepared at the request of Ferguson, as he needed a record of his holdings at Cred. At no point did Podulka advise Ferguson or DGF that Cred was insolvent or that his investment was not insured. At no point did Podulka inform Ferguson that, by that time, his funds were long gone and no longer accessible to him.

59. Ferguson would not have invested in the CredEarn program if he had not been assured that Cred had insurance that covered Cred's losses and his losses.

60. Schatt and Podulka fraudulently concealed from Ferguson that Cred was facing imminent bankruptcy and that his 50 Bitcoin would never be returned. Schatt and Podulka fraudulently represented that his investment was insured.

**F.  Cred Files For Bankruptcy.**

61. Cred filed for bankruptcy on November 7, 2020, just a few months after DGF made the Third Loan, and approximately one month after Podulka personally confirmed Ferguson's balance at Cred.

62. On November 8, 2020, Ferguson emailed Perez stating:

Saw the Ch 11 announcement. . . .Do you have *any* other information whatsoever ? Cuz... for me a ***total*** loss would the functional equivalent of having my house, **and** my son's college education stolen... yet we STILL have NO understanding, ( even vaguely ), of what happened, or if anything may or may not be recoverable ? It's just so utterly devastating. One reason I initially placed confidence in Cred, was it's advertised claim to have 'industry leading' insurance. Was this ever true ?

63. Perez did not respond to Ferguson's email.

64. On November 9, 2020, Perez sent Ferguson an e-mail from his personal gmail account. He relayed that "Thursday, I was laid off with the rest of the sales team as Cred works through their current situation." In the e-mail, Perez candidly relayed that Schatt had lied to him and other sales members about the financial condition of the company. Perez wrote:

"… Dan Schatt said that there would be a full announcement by Monday with details of Cred's current situation and I waited to see them before reaching out. Learning many things for the first time. I am extremely disappointed in the lack of transparency and how everything was handled by the company. Information wasn't being shared with the team or clients as we all tried to discover what had occurred. I believe open communication is key to any success and we were all deprived of it. …"

65. Ferguson lost all of 63.9 Bitcoin he invested with Cred. Today, that bitcoin would be worth more than $2.2 million.

66. The bankruptcy proceedings did not release any claims against Schatt, Podulka and Perez.

## FIRST CAUSE OF ACTION

### Fraud – Intentional Misrepresentation

### (Plaintiffs against all Defendants)

67. Plaintiffs re-allege the allegations set forth in the above paragraphs.

68. Prior to entering each loan, Defendants Schatt and Podulka directed Perez to intentionally misrepresent to Plaintiffs that their investment was insured, that Cred was financially

solvent and that Plaintiffs would reap financial benefits by investing in the CredEarn program, and Perez made these misrepresentations.

69. Defendants knew those representations were false at the time they were made. Defendants never intended to pay Ferguson or DGF back their investments in the CredEarn program.

70. Plaintiffs justifiably relied on these false representations to their detriment and invested 63.9 bitcoin in the CredEarn program, which would be worth more than $2.2 million today. Plaintiffs would not have made these investments but for Defendants' false representations.

71. Defendants intended that Plaintiffs would rely on their misrepresentations and made them to prolong Cred's imminent bankruptcy for their own personal financial benefit.

72. Defendants Schatt and Podulka directed, ratified and/or approved the false representations made by Perez to Plaintiffs and Schatt signed agreements accepting their Bitcoin investments.

73. As a direct and proximate result of Defendants' misrepresentations and Plaintiffs' reliance thereon, Plaintiffs were damaged in an amount to be proven at trial.

74. Defendants' misrepresentations were fraudulent, malicious, unconscionable and oppressive, and were undertaken with conscious disregard for Plaintiffs' well-being. Therefore, these actions entitle Plaintiff to an award of an exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants according to proof.

## SECOND CAUSE OF ACTION

**Fraud – False Promise Without the Intent to Perform**

**(Plaintiffs against all Defendants)**

75. Plaintiffs re-allege the allegations set forth in the above paragraphs.

76. Prior to entering each loan, Defendants Schatt and Podulka directed Perez to intentionally misrepresent to Plaintiffs that their investment was insured, that Cred was financially solvent and that Plaintiffs would reap financial benefits by investing in the CredEarn program, and Perez made these misrepresentations.

77. Defendants Schatt and Podulka directed, ratified and/or approved the false representations made by Perez to Plaintiffs and Schatt signed agreements accepting their Bitcoin investments.

78. Defendants knew those representations were false at the time they were made. Defendants never intended to pay Ferguson or DGF back their investments in the CredEarn program. Defendants' actual intent was to prolong Cred's imminent bankruptcy for their own personal financial benefit.

79. Plaintiffs justifiably relied on these false representations to their detriment and invested 63.9 bitcoin in the CredEarn program. Defendants intended that Plaintiffs would rely on their representations.

80. If Plaintiffs knew Defendants' secret intent was to prolong Cred's imminent bankruptcy for their own personal financial benefit, they never would have invested in CredEarn.

81. As a direct and proximate result of Defendants' misrepresentations and Plaintiffs' reliance thereon, Plaintiffs were damaged in an amount to be proven at trial.

82. Defendants' misrepresentations were fraudulent, malicious, unconscionable and oppressive, and were undertaken with conscious disregard for Plaintiffs' well-being. Therefore, these actions entitle Plaintiff to an award of an exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants according to proof.

### THIRD CAUSE OF ACTION

**Fraudulent Concealment**

**(Plaintiffs against all Defendants)**

83. Plaintiffs re-allege the allegations set forth in the above paragraphs.

84. At the time of Plaintiffs' investments in the CredEarn program, Defendants concealed from Plaintiffs that Cred was financially insolvent, that Plaintiffs' investments were not insured, that Plaintiffs' investments would never be returned and that Plaintiffs would receive no financial gain from their investments.

85. Plaintiffs were ignorant of the facts concealed by Defendants and could not have in the exercise of reasonable diligence discovered the Defendants' concealment. If Plaintiffs had known the facts concealed by Defendants, they would have never invested in the CredEarn program.

86. Defendants had a duty to disclose the facts concealed to Plaintiffs. At the direction of Schatt and Podulka, Defendant Perez made representations about Cred's solvency and insurance but did not disclose facts which materially qualified the facts disclosed, which rendered their disclosure likely to mislead. The facts were known or accessible only to Defendants, and Defendants knew they were not known to or reasonably discoverable by Plaintiffs. The Defendants actively concealed discovery of these facts from Plaintiffs.

87. As a result of Defendants' concealments, Plaintiffs invested 63.9 bitcoin in the CredEarn program, which would be worth more than $2.2 million today. Defendants' concealment was a significant factor causing harm to Plaintiffs.

88. As a direct and proximate result of Defendants' concealments, Plaintiffs were damaged in an amount to be proven at trial.

89. Defendants' concealments were fraudulent, malicious, unconscionable and oppressive, and were undertaken with conscious disregard for Plaintiffs' well-being. Therefore, these actions entitle Plaintiffs to an award of an exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants according to proof.

### FOURTH CAUSE OF ACTION

### False Advertising (Cal. Bus. & Prof. Code §§ 17500 et seq.)

### (Plaintiffs against all Defendants)

90. Plaintiffs re-allege the allegations set forth in the above paragraphs.

91. Defendants' actions described above, including without limitation their representations that Plaintiffs' investment was fully insured, constitute false advertising in violation of the laws of the State of California.

92. Defendants knew or should have known that their advertising statements were untrue and misleading.

93. Defendants' untrue or misleading statements were made for the purpose of disposing of goods, performing services, and/or inducing obligations.

94. As a result of the Defendants' false and misleading advertising, potential and actual consumers have been, and will continue to be, misled about the legitimacy of Defendants' goods, services, or the combination of both being wrongfully marketed, advertised, and sold.

95. By these actions, Defendants have engaged in false advertising and unfair competition in violation of California Business & Professions Code §§ 17500 *et seq.*, and as a result, Defendants have been, and will continue to be, unjustly enriched in profits, income and ill-gotten gains at the expense of Plaintiff and other victims.

96. As a direct and proximate result Defendants' conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### Unlawful Business Practices – Cal. Bus. & Prof. Code §§ 17200, *et seq.*

### (Plaintiffs against all Defendants)

97. Plaintiffs re-allege the allegations set forth in the above paragraphs.

98. Virtually any law or regulation - federal or state, statutory or common law - can serve as predicate for a § 17200 "unlawful" violation. Thus, if a "business practice" violates any law, it also violates § 17200 and may be redressed under that section. See e.g., *People v. E.W.A.P.*, Inc., 106 Cal.App.3d 315, 319 (1980).

99. Defendants' business acts and practices were unlawful as described above under California Business and Professions Code §§ 17200 *et seq*.

100. Defendants' business acts and practices were fraudulent in that a reasonable person would likely be deceived by their material misrepresentations and omissions.

101. Defendants' business acts and practices were unfair in that the substantial harm suffered by Plaintiffs outweighs any justification that they may have had for engaging in those acts and practices.

102. Defendants have engaged in unfair, fraudulent and unlawful practices which have caused Plaintiffs to suffer actual injury in fact and lose money or property.

103. Defendants have acquired money or property or other benefits in amounts to be proven at trial as a direct and proximate result of their unlawful business practices directed at Plaintiffs.

104. Plaintiffs are entitled to recover restitution, including without limitation all benefits that Defendants received as a result their fraudulent business acts and practices; and to injunctive relief restraining Defendants from engaging in further acts of unfair competition.

## DEMAND FOR A JURY TRIAL

105. Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

106. WHEREFORE, Plaintiffs pray for relief as follows:

    a. Judgment in Plaintiffs' favor and against Defendants, jointly and severally, on all causes of action alleged herein;

    b. For general damages and punitive damages under the California fraud claims;

    c. For punitive damages;

    d. Restitution;

    e. For costs of suit incurred herein;

    f. For pre- and post-judgment interest;

    g. For attorneys' fees and costs;

    h. For such other and further relief as the Court may deem to be just and proper.

November 6, 2023

By: /s/ Ellen M. Carey
Ellen M. Carey
Forde & O'Meara LLP
191 N. Wacker Dr., 31st Floor
Chicago, IL 60606
(312) 641-1441 (phone)
ecarey@fordellp.com
Attorney for Plaintiffs Darryl Ferguson and DGF Investments LLC